BLUE LINE HOLDING COMPANY, A CORPORATION, AND GEORGE B. COLEMAN AND SUE COLEMAN, TRUSTEES OF THE BLUE LINE HOLDING COMPANY, A CORPORATION, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74725. Promulgated December 11, 1935.

*H. B. Jones, Esq.*, for the petitioners.
*P. A. Bayer, Esq.*, for the respondent.

### OPINION.

McMAHON: This is a proceeding for the redetermination of a deficiency in income tax for the calendar year 1931 in the sum of $3,615.92.

It is alleged that the respondent erred in adding to income as profit on the sale of assets an amount of $32,542.22. At the hearing the issue was narrowed to the single question of whether the sale was made by the petitioner or whether the assets had theretofore been transferred by petitioner to its stockholders and the sale made by them.

The Blue Line Holding Co., hereinafter referred to as the petitioner, was, until March 14, 1932, a corporation organized and existing under the laws of the State of Washington. On or about that date it was duly disincorporated by proceedings in the Superior Court for King County of the State of Washington. At that time George B. Coleman and Sue Coleman were and thereafter continued to be the trustees of the corporation, and as such were and are empowered under the laws of the State of Washington to manage, continue and wind up the affairs of the corporation. These individuals are residents of Seattle, Washington.

George B. Coleman and Sue Coleman, husband and wife, were the owners of all the stock of the petitioner.

Two brothers, E. Royce and B. Royce, of Portland, Oregon, were desirous of purchasing the taxicab business operated by the petitioner in Seattle. Besides operating taxicabs, the petitioner operated a gasoline station having as an adjunct a shop for repairs, tires, accessories, etc. This station and lot were under lease to the petitioner. The Royces approached George B. Coleman and negotiations were carried on for two or three months prior to March 13, 1931.

On March 13, 1931, George B. Coleman and Sue Coleman, as parties of the first part individually, and as owners of all the stock of the petitioner and of the Royal Blue Cab Co., entered into an agreement with E. Royce and B. Royce, parties of the second part, whereby they agreed to sell to the parties of the second part, or a corporation to be organized by them, to be known as the Royal Blue Taxicab Co., all the assets of such corporation, including 39 automobiles, except cash, deposit on insurance, and assets receivable to March 1, 1931. In payment therefor the parties of the second part agreed to pay $75,000, of which $40,000 was to be in cash. Such parties agreed to assume and pay the installment payments on the taxicabs purchased under conditional sale contracts. The remainder of the purchase price was to be paid in two equal payments, represented by notes. It was agreed therein that all the stock of the new corporation to be organized by the parties of the second part should be placed in escrow with a bank as collateral for payment of the notes. Parties of the first part agreed to dissolve the petitioner and the Royal Blue Cab Co. It was further agreed that George Coleman should be employed as manager of the new corporation for one year.

On March 20, 1931, George B. Coleman and Sue Coleman, as parties of the first part, the petitioner, party of the second part, and E. Royce and B. Royce, as parties of the third part, entered into a supplemental agreement providing in part as follows:

WHEREAS, parties of the first part are not in a position at this time to make and execute a transfer, with the consent of the lessor, of rented premises located in Seattle and now occupied by second party as lessee, and possibly not

in a position at this time to make formal assignments or transfers of taxi licenses, etc., and parties of the third part have not at this date organized a proposed corporation, mentioned in said contract and to be called "Royal Blue Taxicab Co.";

Now, THEREFORE, BY THIS SUPPLEMENTAL AGREEMENT, IT IS AGREED:

1. Parties of the first and second parts have this day made, executed and delivered to parties of the third part a bill of sale of a portion of the properties described in said contract, and have delivered possession of all of said taxicabs and all other of said properties, except possession has not been delivered of said leased premises, nor have third parties executed the notes for the deferred payments of said purchase price nor placed in escrow, as collateral security for the payment of said notes, the stock of said proposed new company.

2. IT IS FURTHER AGREED that within fifteen (15) days from this date, the parties of the first and second parts will do and perform all other things requisite or necessary to fully do and perform the conditions of said contract on their part to be done and performed, including the transfer and assignment of the lease of said leased premises, with the consent of the lessor, and the parties of the third part will, within said period of time, perform all other acts and things by them to be done and performed as provided in said contract.

3. Parties of the first and second parts hereby agree and consent that parties of the third part may organize a corporation under the laws of this state, to be called "Royal Blue Taxicab Co.", and agree to file with the Secretary of State a written consent to said effect, and parties of the third part hereby agree, within a period of five (5) days from this date, to organize said corporation.

4. Second party hereby adopts, ratifies, confirms and approves said contract of March 13, 1931, inasmuch as it is the owner of the property affected by said contract.

Although the above supplemental agreement refers to a bill of sale, there was no bill of sale to the Royces or the corporation to be organized by them prior to April 1, 1931. On that date, by a bill of sale, the petitioner and George B. and Sue Coleman, as parties of the first part, in consideration of the sum of $10 " and other good and valuable consideration, to them in hand paid by Royal Blue Cab Company, * * * party of the second part", purported to sell and transfer to the party of the second part certain listed personal property, including 12 taxicabs, " it being the intention of the parties of the first part to convey generally the physical properties located at 2104 Second Avenue or wherever found and used in the conduct of the business of first parties at said location. * * * and subject to the provisions of that certain agreement entered into on the 13th day of March, 1931 * * *." This bill of sale was signed for the petitioner by G. B. Coleman, president, and Sue Coleman, secretary, and was also signed by G. B. Coleman and Sue Coleman as stockholders of petitioner.

The $40,000 down payment was made by a cashier's bank check, dated April 9, 1931, payable to the petitioner. Such check was endorsed for the petitioner by G. B. Coleman, president, and thereafter by G. B. Coleman individually. It was cashed on April 14,

1931. The check was received by George B. Coleman, who cashed it and appropriated the money to his own use.

The Royal Blue Cab Co. and the Royce brothers, as individuals, executed two promissory notes, each dated April 11, 1931, and each in the principal sum of $10,746.20, with interest at 6 percent, one being payable October 1, 1931, and the other April 1, 1932, to the order of G. B. Coleman. These notes were received by Coleman, who did not turn them over to the petitioner but kept them personally. When the notes were paid, the proceeds were placed in his own personal account. On April 16, 1932, G. B. Coleman acknowledged receipt of the amount due under the note, the maturity date of which was April 1, 1932, and authorized the escrow agent to release the stock to the Royal Blue Cab Co. He thereby released such company from any and all claims he might have against it, except for salary. The remainder of the purchase price of $75,000 was made up of contracts payable assumed by the purchaser. These amounted to $13,507.60.

By instrument dated April 11, 1931, E. Royce transferred in escrow to a bank of Seattle, as collateral security for the payment of the promissory notes, 396 shares of the capital stock of the Royal Blue Cab Co. owned by him. It was therein recited that the Royal Blue Cab Co. jointly with E. Royce and B. Royce had delivered to George B. Coleman two notes as a part of the purchase price of taxicabs and equipment purchased by the Royal Blue Cab Co. from the petitioner and George B. Coleman and Sue Coleman, his wife, as stockholders thereof. In such escrow agreement, E. Royce agreed that in the event of the nonpayment of the notes or interest, the bank had authority to deliver the stock to George B. Coleman for foreclosure.

There is nothing in the books of petitioner to show the disposition of its assets by way of dividend or otherwise, or that petitioner received the purchase price of $75,000 or any part of it.

In the income tax returns of George B. Coleman and Sue Coleman for 1931 there is no showing of a distribution to them of assets of petitioner as a dividend or otherwise.

In the income tax return of petitioner for 1931 there was no showing of the disposition by petitioner of its assets except that in the balance sheet forming a part of the return the assets shown at the end of the year are considerably less than the assets shown at the beginning of the year. Petitioner returned no profit in such return upon the disposition of its assets.

In the notice of deficiency the respondent treated the sale as a sale by petitioner of its assets and included in its taxable income a gain of $32,542.22 upon the sale. In determining the cost thereof to the

petitioner the respondent accepted the cost balances appearing in the petitioner's ledger, less the reserve for depreciation shown therein.

Upon the foregoing facts, which we find, the sole question presented for our determination is whether the profit of $32,542.22 determined by respondent to have been derived from the sale of the assets in 1931 to the Royce brothers or a corporation organized by them was income to the petitioner. There is no issue raised as to the amount of profit, but the petitioner contends that the sale was not made by it, but by its stockholders, to whom it had previously transferred its assets. Respondent held that the sale was made by petitioner and that the gain is taxable to petitioner.

The respondent's holding that the profit was income to the petitioner has the support of a presumption of correctness and the petitioner has the burden of proving it to be wrong. *Welch* v. *Helvering*, 290 U. S. 111.

Assuming its burden, the petitioner attempted to show a transfer of the assets from it to its two stockholders and from them to the ultimate purchaser. Witnesses for the petitioner testified, in substance, that such was the plan and that it was adopted in order to save tax; that a meeting of the two stockholders was held at or about April 1, 1931, at which an arrangement was made between the petitioner and its stockholders with regard to the transfer of the assets; that this arrangement was recorded in the minutes of a special meeting of the board of trustees; that such minutes contained a resolution by the trustees declaring a dividend in an amount of $30,000 and providing that the dividend should be paid by the transfer of certain specified items of personal property to the two stockholders; that a bill of sale was drawn transferring the assets from the petitioner to the two stockholders; and that both the bill of sale and the minutes are lost and can not be found.

However, under all the facts and circumstances, the testimony of these witnesses is not adequate to establish petitioner's contention. There is nothing in the record from which we can determine the provisions of the bill of sale or the minutes. No witness has informed us as to the language or details of the alleged arrangement, minutes or bill of sale. All we have in this respect are the opinions or conclusions of the witnesses to the effect that such arrangement and minutes furnished the basis for a transfer or distribution of the assets to the stockholders, and that a purported bill of sale accomplished a sale or distribution. These are the vital questions which we are called upon to decide in the instant proceeding and we can not permit the witnesses' opinions or conclusions to be substituted for our decision. Furthermore, the respondent challenges the existence of such minutes and bill of sale, and there is evidence in the

record which tends to support his position in this respect. There is no basis in the evidence as a whole for findings of fact or conclusions of law, made in the exercise of our independent judgment, to the effect that the parties accomplished a sale or distribution of any of the assets in question from the petitioner to its stockholders, the Colemans.

On the other hand, we know that on March 13, 1931, the date the agreement to sell was executed, the Colemans were stockholders of the petitioner and not owners of its property, they signing such agreement as stockholders rather than owners of assets; that in the supplemental agreement of March 20, 1931, the petitioner was made a party and confirmed the agreement of March 13, 1931, " *inasmuch as it is the owner of the property affected by said contract* "; that the bill of sale dated April 1, 1931, by which the assets were transferred to the Royce's corporation, the Royal Blue Cab Co., was executed by the petitioner; that the Colemans, in signing such bill of sale, signed only in their capacities as officers of the petitioner and as stockholders thereof, and not in their capacities as individuals; that the check representing the initial payment in the purchase of the assets was made payable to the petitioner; that in the escrow agreement it was recited that the assets were purchased from the petitioner and the Colemans as stockholders thereof; that some of the assets of the petitioner, notably the lease, were never transferred by the petitioner to the stockholders; and that neither the individual income tax returns of the Colemans nor the return of the petitioner for 1931 showed a distribution or sale of the assets of petitioner to its stockholders. Vital things, about which there is no dispute, which the parties actually did and omitted to do in regard to the transaction are more persuasive than conflicting parol evidence. They support respondent's determination.

It may be added that in our opinion the fact that the bill of sale was executed by the corporation is open to the inference that the purchaser would not accept title to the assets from the stockholders as individuals.

While the petitioner does not make the contention that it derived no income for the reason that it never actually received the proceeds of the sale (such proceeds having been retained by its stockholder, Coleman, personally), it may not be amiss to state that the fact that the petitioner did not take action to recover the proceeds from its stockholder does not relieve it of liability for the tax. See *Garrison Bros. State Bank* v. *Commissioner*, 67 Fed. (2d) 486, affirming *Garrison Bros. State Bank*, 25 B. T. A. 673. Furthermore, there is no evidence to establish that Coleman did not account to the corporation for the moneys paid for the assets.

We note that in the agreement to sell, dated March 13, 1931, the assets to be transferred are referred to as those of the petitioner and also of the Royal Blue Cab Co. However, the petitioner makes no contention that for this reason the profit was not all income to it, and the facts do not justify our disturbing the respondent's determination upon this ground.

After considering all of the evidence in the record, we are constrained to hold that the petitioner has not overcome the presumption in favor of the correctness of the respondent's determination.

*Decision will be entered for the respondent.*